UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MD ISLAM, DOH OUATTARA, ABDUL RUMON,
HARNEK SINGH, and NEW YORK TAXI
WORKERS ALLIANCE,

Plaintiffs,

Civil Action No. 20-cv-2328

-Against-

COMPLAINT

ANDREW CUOMO, GOVERNOR OF THE STATE
OF NEW YORK, THE NEW YORK STATE
DEPARTMENT OF LABOR, and ROBERTA
REARDON, as COMMISSIONER OF LABOR,

Defendants.
-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.　　Plaintiffs bring this case to challenge the New York State Department of Labor's (DOL) failure to provide unemployment insurance ("UI") benefits to Plaintiffs MD Islam, Doh Ouattara, a/k/a Seydou Ouattara, Abdul Rumon, and Harnek Singh ("Individual Plaintiffs") and all former drivers for Uber, Lyft, and other app-based For-Hire Vehicle ("FHV") service employers in a timely manner, as the DOL does for employees of other companies determined to be employers by New York State.

2.　　The DOL's failure to do so in the midst of the COVID-19 pandemic, when the difference between receiving UI benefits in two weeks rather than two months can determine whether an unemployed New Yorker can put food on the table, is devastating to thousands of drivers and their families, the overwhelming majority of whom are immigrants.

3.     The DOL's inaction flies in the face of settled law.  In 2018, the New York State Unemployment Insurance Appeal Board ("UIAB") determined three Uber drivers and "any other individuals similarly employed as a driver" to be employees under the UI law.  Unemployment Insurance Appeal Board Nos. 596722-596727 (Jul. 12, 2018) ("The Uber UIAB Decision"), attached as Appendix A.[1]  In spite of these final determinations, the DOL has made no changes to the way it processes app-based drivers' applications for UI benefits.  The DOL has continued to treat app-based drivers' applications for benefits as though they are independent contractors, placing the burden on drivers to prove their earnings and employment status.  As the DOL has not required app-based car service companies to supply their earnings data, drivers' benefit rates cannot be determined, delaying the delivery of benefits to drivers by months.

4.     Despite the finality of the UIAB Uber decision, and the breadth of the New York Court of Appeals' recent decision in *Matter of Vega (Postmates)*, 2020 NY Slip Op 02094, 2020 N.Y. LEXIS 655 (Mar. 26, 2020), finding app-based workers with similar working arrangements as app-based drivers to be employees, the DOL has failed to require app-based companies to provide wage data, as state law empowers it to do, and is failing to timely process the UI applications of app-based drivers who have submitted their earnings data as requested.  The DOL has even returned findings of $0 in wages earned in employment when drivers did fax in

---

[1] Typically, decisions of the UIAB are available online at the UIAB's website at https://uiappeals.ny.gov/searchdecisions.  While Appeal Board Nos. 596722-596727 were once posted there, they have since curiously disappeared from public view, in apparent violation of New York Administrative Procedure Act § 307(3)(a).  *See id.* (Date last accessed: May 25, 2020).

earnings data as requested by the DOL. The DOL is thus ignoring its own precedent and that of the state's highest court. These failures delay the process for delivering benefits to drivers, often by up to eight weeks or more, for no discernible reason.[2] Moreover, in this unprecedented crisis of unemployment, Defendant DOL's actions are sentencing drivers to a prolonged period without income to support themselves and their families during the chaos and instability caused by COVID-19.

5.    Defendants' actions deny Individual Plaintiffs the right to UI benefits in violation of Title III of the Social Security Act of 1935, 42 U.S.C. §§501-504, and the United States Constitution. Plaintiffs seek an order prohibiting Defendants from misclassifying app-based drivers as independent contractors and issuing incorrect $0 MBDs to all app-based drivers, in defiance of settled precedent; enjoining Defendants to immediately pay benefits to Individual Plaintiffs and all app-based drivers in compliance with these statutes and in accordance with UIAB and New York State precedent; enjoining Defendants to begin requiring Uber, Lyft and other app-based FHV employers to provide driver earnings data to New York State; and declaring that Defendants' actions in failing to pay UI benefits to Individual Plaintiffs and all app-based FHV driver claimants in New York State, in accordance with settled precedent,

---

[2] Plaintiffs note that the history of New York Uber drivers' ability to obtain benefits has been marked by a lack of transparency and disregard for the UI law. Notably, in 2015-16, the DOL took no action on any Uber driver UI claims at all for an extended period. When claimant Levon Aleksanian, wrote the DOL to ask why, after months of waiting, his claim had not been processed, DOL staff wrote back to him, informing him that, "All Uber claims we have are under Executive review," and that this meant that "the Dept of Labor is not making the decision whether or not this employment is covered." After 10 months of waiting, Mr. Aleksanian filed a federal lawsuit against Governor Cuomo and the DOL, and his claim was immediately processed. *See*, *Aleksanian et al v. Cuomo et al*, 16-cv-04183 (ILG) (E.D.N.Y), Dkt. #1.

violate Title III of the Social Security Act of 1935, 42 U.S.C. §§ 501-504 and the Equal

Protection Clause of the 14th Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this district and the Defendants perform their official duties in this district.

8. Plaintiff MD ISLAM resides in Astoria, Queens County, New York.

9. Plaintiff DOH OUATTARA resides in Bronx County, New York.

10. Plaintiff ABDUL RUMON resides in Bronx County, New York.

11. Plaintiff HARNEK SINGH resides in Westbury, Nassau County, New York.

12. Plaintiff NEW YORK TAXI WORKERS ALLIANCE ("NYTWA") is a not-for-profit membership organization with offices located at 31-10 37th Avenue, Suite 300, Long Island City, NY 11101.

13. Defendant ANDREW CUOMO is the Governor of the State of New York.

14. Defendant NEW YORK STATE DEPARTMENT OF LABOR (DOL) is a department of the State of New York existing pursuant to Chapter 31 of the laws of the State of New York. Counsel's office for DOL is located at the Harriman State Office Campus, Building 12, Room 509, Albany, NY 12240. The DOL maintains offices throughout New York City, including in Brooklyn and Queens.

15. Defendant ROBERTA REARDON is the Commissioner of Labor for the State of New York.

## STATUTORY AND REGULATORY SCHEME

### "When Due" Clause

16.     Title III of the Social Security Act of 1935, 42 U.S.C. §§501-504, provides

payments to the states to finance the administration of their unemployment compensation laws.

A state is eligible to receive payments only after the Secretary of Labor certifies that its laws

meet certain federal requirements, including that:

> the law of such State, approved by the Secretary of Labor under the Federal
> Unemployment Tax Act [26 U.S.C.A. § 3301 et seq.], includes provision for--
> (1) Such methods of administration…as are found by the Secretary of Labor
> to be reasonably calculated to insure full payment of unemployment
> compensation ***when due….***

42 U.S.C. § 503(a)(1) (emphasis added).

17.     This section of the Social Security Act is otherwise known as the "when due"

provision.  The federal regulation interpreting the "when due" provision requires that state

unemployment compensation laws provide for "such methods of administration as will

reasonably insure the full payment of unemployment benefits to eligible claimants with the

greatest promptness that is administratively feasible."  20 C.F.R. § 640.3(a).

### United States Constitution

18.     Under the Fourteenth Amendment, Section 1 of the Constitution of the United

States, no state shall deny to any person within its jurisdiction the equal protection of the laws.

### Section 1983

19.      Section 1983 establishes a private cause of action against any person who acts

under color of state law to deprive individuals of "any rights, privileges, or immunities secured

by the Constitution and laws" of the United States.  42 U.S.C. § 1983.

**New York Unemployment Insurance Law and Procedure**

20.     N.Y. Labor Law § 501, which sets forth the public policy of the state regarding unemployment insurance, notes, in relevant part, "Economic insecurity due to unemployment is a serious menace to the health, welfare, and morale of the people of this state."  The Legislature noted the need to create a system of unemployment insurance to reduce the burden of involuntary employment which had often fallen, "with crushing force upon the unemployed worker and his family," and that, "the problem of unemployment can better be met by the so-called compulsory unemployment insurance plan than it is now handled by the barren actualities of poor relief assistance backed by compulsory contribution through taxation." *Id.*

21.     N.Y. Labor Law § 502, which sets forth the legislature's findings and policy on wage reporting, notes the importance of a wage reporting system to the timely delivery of benefits, stating in relevant part:

> Given the size and complexity of the unemployment insurance system, an increase in efficiency will necessarily result in significant improvements in the services provided to benefit claimants and employers. The improvements for benefit claimants that would result from the implementation of a wage reporting system include more timely and accurate entitlement and benefit rate determinations, a reduction in the need to rely upon a claimant's own tax and wage statements and a decrease in claimant overpayments which must be recovered at a later date.

22.     New York Labor Law § 575(1) requires every employer to keep records of all employees, their amount of remuneration, social security numbers, and other data which must "be open to inspection at any time and as often as may be necessary" and which data shall be reported to the DOL.

23.     DOL regulations require every employer in New York State to maintain and submit employee earnings data to the DOL.  12 N.Y.C.R.R. §§ 472.2, 472.3(c).

24.     If the DOL requests access to an employer's payroll records, refusal to provide access is a misdemeanor.  N.Y. Labor Law § 634.

25.     New York employers who are liable for unemployment insurance contributions or for payments in lieu of such contributions pursuant to article eighteen of the Labor Law, must file wage reporting information on a quarterly basis.  N. Y. Tax Law § 674(a)(4)(A).

26.     New York Tax Law § 171-a(4) provides that Defendant DOL and the commissioner of the New York State Department of Taxation and Finance must enter into a cooperative agreement that allows DOL to inspect wage reporting records.

27.     If an employer has not reported its employees' wages to the DOL, when its employees apply for UI benefits, they will typically receive Monetary Benefit Determinations (MBDs) showing $0.00 in earnings.

28.     When claimants receive MBDs showing $0 in earnings, despite having earned wages in employment, in order to have their wages counted towards a benefit rate, such employees must complete a Request for Reconsideration form, providing the DOL with information about their quarterly earnings, and provide supporting documentation from their own records.  *See* New York State Department of Labor, Unemployment Insurance, "A Claimant Handbook" (March 2020) ("UI Claimant Handbook"), *available at* https://labor.ny.gov/formsdocs/ui/TC318.3e.pdf, at 11-12, 47, attached as Appendix B.

**Unemployment Insurance Benefit Determination Procedure**

29.     Claimants apply for UI online or by telephone. *See* UI Claimant Handbook at III.

30.     Upon receipt of an application, the DOL makes a Monetary Benefit Determination ("MBD") regarding the claimant's monetary eligibility for unemployment benefits by determining if the claimant has sufficient earnings during a base period representing one year (four calendar quarters) of work and wages.  *See* N.Y. Labor Law § 527; UI Claimant Handbook at 9-11.  The basic base period is the first four of the last five completed calendar quarters before the quarter in which the claimant files for benefits.  UI Claimant Handbook, at 9. If the claimant has not earned sufficient wages in the basic base period, the DOL will use the alternate base period.  *Id.*  The alternate base period is the last four completed calendar quarters before the quarter in which the claimant files for benefits.  *Id.*

31.     In order to qualify for unemployment benefits, the claimant must meet three requirements regarding their earnings during the basic or alternate base period.  *Id.* at 10.  First, the claimant must have worked and been paid wages covered by the unemployment insurance law in at least two calendar quarters.  *Id.*  Second, the claimant must have been paid at least $2,600 in one calendar quarter.  *Id.*  Third, the total earnings during the base period must be at least 1.5 times the amount paid in the high quarter. N.Y. Labor Law § 518(a); UI Claimant Handbook at 10.

32.     The MBD is based on wages that have been reported by employers to the New York State Department of Taxation and Finance. N.Y. Tax Law § 171-a; N.Y. Labor Law §§ 527, 590, 597; UI Claimant Handbook at 11.  If a claimant believes they have been misclassified as an independent contractor by their employer, at the request of the claimant, the DOL investigates the alleged misclassification in order to make a determination as to whether earnings

8

from the putative employer constitute wages which can be used to establish an unemployment benefits claim under the UI law.  UI Claimant Handbook at 10-11, 47.  If the DOL finds that additional wages should be included during the relevant base period, it will issue a revised MBD reflecting the additional wages and benefit rate.  *Id.* at 11.

33.     The MBD only establishes monetary eligibility for UI benefits but does not signify that the claimant has been approved for UI benefits.  *Id.* at 11.  To be eligible for UI benefits, a claimant must also have lost work through no fault of their own; be ready, willing and able to work; and be actively looking for work.  N.Y. Labor Law §§ 527, 591, 593.  The DOL makes a separate determination approving or denying the claimant's UI benefits called the "initial determination."  N.Y. Labor Law §597; UI Claimant Handbook at 11.

34.     The claimant or the employer can request a hearing to challenge the "initial determination" pursuant to N.Y. Labor Law §620.

35.     A decision of a referee, if not appealed from, shall be final on all questions of fact and law.  A decision of the Appeal Board shall be final on all questions of fact and, unless appealed from, shall be final on all questions of law.  N.Y. Labor Law §623 (1).

36.     According to the DOL, if a claimant is eligible for UI, "your first payment will generally be made two to three weeks from the time you file your claim."  UI Claimant Handbook at 14, *see also*  https://twitter.com/NYSLabor/status/1258465054300819457 (May 7, 2020) (Date accessed:  May 24, 2020), attached as Appendix C.

**Pandemic Unemployment Assistance**

37.     Section 2102 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, 15 U.S.C.A. § 9021, establishes Pandemic Unemployment Assistance ("PUA"), a temporary

federal program that provides up to thirty-nine weeks of benefits to individuals who are not otherwise eligible for state UI benefits, including workers who are independent contractors or self-employed.  15 U.S.C.A. §§ 9021(c)(2), (a)(3)(A)(i).

38.     15 U.S.C.A. § 9021(h) establishes that, unless otherwise provided by § 9021, the regulations promulgated to implement the Disaster Unemployment Assistance program, 20 C.F.R. § 625.1 *et seq.*, will apply to PUA as if "COVID-19 public health emergency" is substituted for the term "major disaster," and "pandemic" is substituted for the term "disaster."

39.     Claimants may only be eligible for PUA benefits if they are not eligible for unemployment compensation under a state UI program.  *See* 20 C.F.R. § 625.4(i).

40.     That is, in most circumstances, app-based drivers in New York could only be eligible for PUA if the state finds them to be independent contractors with no right to UI.

41.     Further, "[s]elf-attestation is not sufficient to demonstrate ineligibility for regular UC [benefits]."  U.S. Department of Labor Unemployment Insurance Program Letter No. 16-20 Change 1 (April 27, 2020) (Hereafter, "April 27 PUA Guidance"), at I-6, attached as Appendix D.

42.     The PUA weekly benefit rate ("WBR") is calculated in the same way as the New York State UI benefit rate is calculated except that instead of using gross earnings, the PUA WBR will be based on an applicant's 2019 net earnings.  If there are no earnings in 2019 or the benefit would be less than 50% of the average WBR (currently $182), then the PUA WBR will be 50% of the average WBR.  *See Id.*, at Attachment II.

43.     Unless an applicant for UI or PUA had net earnings of $18,928 or less in 2019, they will generally have a benefit rate that is higher for regular UI than for PUA because their

gross earnings are used to calculate the WBR for UI versus net earnings for PUA. N.Y. Labor Law § 518; U.I. Claimant's Handbook at 18, 20 (UI WBR to be calculated based on all remuneration or "gross" pay); 20 C.F.R. §625.6(a)(2); April 27 PUA Guidance, at I-6 (PUA benefit rate to be based on a claimant's net income).

## STATEMENT OF FACTS

44. Uber, Lyft, and other mobile application ("app")-based car services are corporations offering Black Car transportation service.

45. As the UIAB has found Uber drivers to be employees, Uber is the largest private sector employer in New York City. *See* James A. Parrott & Michael Reich, *An Earnings Standard for New York City's App-Based Drivers, Report for the New York City Taxi and Limousine Comm'n*, at 69 (July 2018), *available at* https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5b3a3aaa0e2e72ca74079142/1530542764109/Parrott-Reich+NYC+App+Drivers+TLC+Jul+2018jul1.pdf, attached as Appendix E.

46. Individual Plaintiffs' primary job duty was to drive black car customers from a pick-up point to a drop-off point in the City of New York and the surrounding areas. Individual Plaintiffs received assignments through the use of the Uber and/or Lyft applications (hereinafter "app") on their cell phones.

47. Like other misclassified workers, drivers for app-based car services work long hours for low pay with few of the protections associated with traditional employment.

48.     In New York City, 90.4% of app-based FHV drivers are foreign-born. 2018 Taxi & Limousine Commission Factbook at 15, *available at* https://www1.nyc.gov/assets/tlc/downloads/pdf/2018_tlc_factbook.pdf.

49.     By comparison, immigrants comprise only 44.2% of the New York City labor force. New York City Mayor's Office for Economic Opportunity, *An Economic Profile of Immigrants in New York City 2017* (Feb. 2020) at 11, *available at* https://www1.nyc.gov/assets/opportunity/pdf/immigrant-poverty-report-2017.pdf (Date accessed: May 4, 2020).

**New York State's Prior Treatment of App-Based FHV Drivers Under the UI Law**

50.     Uber and Lyft do not consider the Individual Plaintiffs or any of their drivers to be employees even though Uber and Lyft exercise substantial supervision, direction, and control over their drivers, and the UIAB and reviewing courts have found that app-based drivers and similarly situated app-based workers are employees for the purpose of UI benefits. *See*, *In the Matter of Uber Technologies, Inc.*, Appeal Board Nos. 596722-596727 (Unemployment Insurance App. Board July 12, 2018), *supra*, (finding New York City based Uber drivers to be employees); *In the Matter of Uber Technologies, Inc.*, Appeal Board Nos. 603938-603937 (Apr. 29, 2019) (finding Uber drivers in New York State, outside of New York City, to be employees), attached as Appendix F; *see also*, *In the Matter of Lyft Inc.*, Unemployment Insurance Appeal Board, Administrative Law Judge Section, ALJ No. 017-00996 (Oct. 24, 2017), attached as Appendix G; *see also*, the New York Court of Appeals' decision in *Matter of Vega*, *supra*.

51.     Specifically, since at least 2015, Uber and a number of former drivers have engaged in a protracted legal dispute to determine whether drivers are employees for the purpose of unemployment insurance benefits.

52.     On July 28, 2016, two former Uber drivers initiated a federal lawsuit alleging that the DOL and several other defendants violated the "when due" provision of the Social Security Act, as well as the Equal Protection and Due Process clauses of the United States Constitution as a result of their failures to investigate and adjudicate plaintiffs' UI claims.  *Aleksanian v. Cuomo*, No. 16-cv-4183(ILG) (E.D.N.Y), at Dkt. #1.

53.     The lawsuit was filed after Mr. Aleksanian had waited 10 months after filing for UI benefits without receiving any determination on his claim.  Instead, DOL staff merely told him, via email, that his claim, and all Uber claims, were under "executive review which means the Dept of Labor is not making the decision whether or not this employment is covered.  Your claim will remain pending until such time a [*sic*] determination has been made."

54.     Shortly after the lawsuit was filed, the DOL began processing the applications and issued determinations that both drivers were employees of Uber.  *Aleksanian v. Cuomo*, No. 16-CV-4183, 2017 WL 2881134, at *1 (E.D.N.Y. July 6, 2017).  On July 6, 2017, the United States District Court in the Eastern District of New York held that, as a result of these actions, the claim was rendered moot.  *Id.*

55.     Uber contested the DOL's initial determinations that the drivers were employees.  On June 9, 2017, an Administrative Law Judge overruled Uber's objections, finding in favor of the drivers.  Uber appealed once again, this time to the UIAB, a state board that decides issues of

13

UI benefit eligibility and UI contribution liability.  After eleven months, and multiple UIAB hearings, Uber attempted to withdraw its appeal.

56.     The UIAB rejected Uber's attempt to withdraw and issued a final ruling in July 2018, upholding the prior decisions determining that the drivers and similarly situated individuals were employees for the purposes of UI benefits.  Appeal Board Nos. 592722-596727 (July 12, 2018), *supra*.

57.     Although Uber filed a notice of appeal to the New York Supreme Court, Appellate Division, it ultimately withdrew its appeal, claiming that it did not want to appeal that specific case anymore, but hoped to appeal other cases in the future.  As a result, the UIAB's decision stands as a final determination of law, and represents the final and uncontested position of New York State on the eligibility of Uber drivers for UI.  *See* N.Y. Labor Law §623 (1).

58.     Upon information and belief, between the time when the 2018 Uber UIAB Decision was issued and the onset of COVID-19 in New York, the DOL ultimately found every Uber and Lyft driver who applied for UI to be an employee under the UI law.

59.     Upon information and belief, during this same period, Uber requested hearings to contest these findings, but never appeared at any of the scheduled UIAB hearings in New York City, allowing all of these decisions to stand, and leaving the 2018 Uber UIAB decision uncontested.

60.     Because all New York City Uber drivers operate pursuant to the same uniform contracts, terms and policies, the Appeal Board's finding of employee status for the individual

claimants at issue and "those similarly employed" extends to all drivers in New York City earnings wages by driving for Uber.[3]

61.    On April 29, 2019, the UIAB also ruled that an Uber driver operating in Uber's New York market outside of New York City, and all those similarly employed, were employees under the UI Law. Unemployment Insurance Appeal Board Nos. 603937-603938 (Apr. 29, 2019).

62.    In his 2020 State of the State Address, Governor Cuomo, echoed the holdings of his agencies regarding app-based drivers, saying of the "gig economy," "[a] driver is not an independent contractor simply because she drives her own car on the job…It is exploitive, abusive, it's a scam, it's a fraud, it must stop, and it has to stop here and now."  Gov. Andrew Cuomo, 2020 State of the State Address, at minute marks 51:54; 52:25 *available at* https://www.governor.ny.gov/programs/2020-state-state-address.

---

[3] All Uber drivers within Uber's New York City market are subject to uniform terms and policies, as Uber has acknowledged in its filings to the National Labor Relations Board. *See*, Uber NLRB Position Statement, 29-RC-184415 (Sep. 27, 2016), attached as Appendix H, at Exhibit D, pp. 10-11 (stating that all of Uber's New York City drivers "are governed by similar terms and conditions for using the Uber app as defined by Uber's Service Agreement."  A more recent example of Uber's uniformly applied policies in the New York City market is its recent policy to begin restricting driver hours based on a rubric of the drivers' star rating on a scale from 1-5, and the amount of trips the driver has recently performed. *See*, *Important Changes to Driving in New York City* (website), https://www.uber.com/blog/new-york-city/tlc-rule-changes/ (Sep. 12, 2019), attached as Appendix I (Date accessed May 18, 2020) (Describing the new scheduling policy as "apply[ing] to all TLC-licensed drivers who complete trips with Uber in NYC," with the exception of drivers of wheelchair-accessible vehicles, and setting forward uniform times for drivers to sign up for scheduled blocks of working time, depending on their rating and number of recent trips).

63.     Since New York City began shutting down in mid-March in response to the spread of the COVID-19, professional drivers have found themselves, along with much of the workforce, largely unemployed as ridership evaporated.

64.     Unable to make a living with almost all of New York staying home, Individual Plaintiffs found themselves with a lack of work, and applied for UI.

65.     Despite having filed for UI as early as early March, many app-based drivers have still not received any unemployment benefits as of the time of this filing.

66.     Many of these drivers had faxed their earnings records to the DOL in late March, at the DOL's request, and yet have still not received benefits.  Indeed, in spite of these submissions, the Individual Plaintiffs still received MBDs that showed no earnings in employment for UI purposes from their work for Uber and Lyft.  Thus, by issuing zero benefit MBDs, after receipt of drivers' Uber and Lyft earnings records, the DOL effectively determined drivers to be independent contractors with no right to UI, in willful disregard of settled precedent.

67.     On March 26, 2020, the New York Court of Appeals held that Postmates, a company which uses a similar, app-based model to employ delivery couriers, was an employer under the N.Y. UI  law.  *Matter of Vega*, *supra*, at *1.  This decision makes clear that the UIAB's determinations that Uber and Lyft are the employers of their drivers for UI purposes are unquestionably the law in New York.[4]

_____

[4] Notably, for example, the record in the Uber UIAB cases contains far more indicia of control than was present in *Vega*.  For example, among facts indicating a higher level of control exercised by Uber, the UIAB's decision and the record noted that, *inter alia*, Uber required

68.     Given the Appeal Board's unambiguous and binding decisions regarding Uber drivers and the Court of Appeals' decision in *Vega*, the notion that app-based drivers in New York are not employees, or that their status for UI purposes is still unsettled is, at this point, simply absurd.

69.     Yet, despite these rulings, the DOL's procedure for processing UI claims from app-based drivers has not changed. The state still does not require Uber or other similar companies to contribute to the unemployment insurance fund, and the companies do not report drivers' wages to the state.  *See* Noam Scheiber, *Drivers Say Uber and Lyft Are Blocking Unemployment* Pay, NEW YORK TIMES, March 24, 2020, *available at* https://www.nytimes.com/2020/03/24/business/economy/coronavirus-uber-lyft-drivers-unemployment.html (Date accessed: May 18, 2020), attached as Appendix J.  As a result, drivers are forced to prove their employment status in a complicated bureaucratic process that can take months to resolve, which results in drivers waiting months to receive benefits.  *Id.*

70.     Upon information and belief, Uber and Lyft have not submitted the wage earnings data as required by New York Law.  Further, upon information and belief, the DOL has not sought to compel Uber and Lyft to provide earnings records, per N.Y. Labor Law §634.

71.     Even after the Court of Appeals' *Vega* decision, the DOL continued to signal to Uber drivers and other app-based "gig workers" that they were not employees entitled to regular UI benefits.

---

drivers to take, "the most efficient route or risk a complaint and/or deduction in pay;" that Uber monitored drivers' braking and acceleration rates through the app and that such data would be used to verify consumer complaints; that Uber managed staff who "utilize Driver data points 'to monitor driver behavior and ensure efficiency.'" *See* UIAB Nos. 596722-596727.

72.     On April 20, 2020, the DOL announced the creation of a format for applying for PUA.  This announcement included information about the types of workers who would be eligible for PUA, as opposed to regular UI benefits.  This notice presented "New Yorkers who worked for an app-based company (i.e. 'gig workers')" as an "example" of the type of worker who would be covered by PUA.  *NYS Department of Labor Launches New Streamlined Application for New Yorkers to Apply for Pandemic Unemployment Assistance Without Having to First Apply for Unemployment Insurance* (website) (Apr. 20, 2020), *available at* https://www.governor.ny.gov/news/nys-department-labor-launches-new-streamlined-application-new-yorkers-apply-pandemic (Date Accessed: May. 24, 2020), attached as Appendix K.

73.     The DOL published another guidance document on April 20 that specifically instructed unemployed "gig workers" to apply for PUA.  *Pandemic Unemployment Assistance* (website), *available at* https://www.labor.ny.gov/ui/pdfs/pua-factsheet.pdf (Date Accessed: May 24, 2020), attached as Appendix L.  These guidance documents effectively identify app-based drivers as independent contractors who would otherwise be ineligible for regular UI benefits, and instruct them to apply for PUA.

74.     Despite the clarity provided by the UIAB and the Court of Appeals, by publishing such guidance, the DOL indicates an intent to disregard binding decisions, and route Individual Plaintiffs' applications to PUA.

75.     Individual Plaintiffs received MBDs that indicated $0 in earnings from Uber or Lyft, in some cases, even after they faxed earnings data to the DOL, indicating that the DOL considers them to be independent contractors ineligible for UI.

76.     Such actions, combined with the DOL's prior failure to enforce the Labor Law and require the reporting of wage data so that app-based drivers' UI claims could be processed the same as other employees in New York, have led to significant delays in the delivery of benefits, at a time when workers can least afford them.

77.     These actions not only violate the rights of the Individual Plaintiffs but undermine the statutory scheme created by the Unemployment Insurance Law.  If a company never has to supply worker earnings data after a final decision because they intend to continue contesting employee status, the Unemployment Insurance system would simply not be able to function. Companies would not contribute to the UI fund or provide wage data, forcing drivers and the DOL to engage in a protracted, individualized determination of eligibility for every worker.  By engaging in this behavior, Uber is setting an untenable and unsustainable precedent for other companies, while the DOL stands idly by.  If such a process continues, the proper application of the UI program for 100,000 New York Uber drivers would be forever frozen while Uber perpetuates a never-ending cycle of appeals.

78.     Of a group of over 800 NYTWA members who responded to a survey assessing their needs during the pandemic, as of May 12, 55.2% said they were close to not having enough money for groceries, and 27.6 % said they did not have enough money for groceries.

79.     Drivers who would continue to work part-time for a few fares, to secure some immediate income, risk exposing themselves and their families to the virus in a manner unique among commercial drivers, as app-based drivers have typically lacked the type of plexiglass partition between themselves and their passengers common in taxicabs, and are not able to create the recommended six feet of distance.

80.     As of May 14, at least 51 TLC-licensed drivers had died of COVID-19 related illness.

81.     Given the anticipated cyclical nature of COVID,[5] there may be another wave of applicants for unemployment at a later date.  Should another wave of COVID affect the City, unless the DOL begins to enforce the UI law against companies like Uber and Lyft, and mandates wage reporting by such companies, the lengthy delays in receiving benefits that drivers are experiencing and the DOL's violation of the Social Security Act will merely be repeated.

## PLAINTIFF MD ISLAM

82.     Plaintiff MD Islam is an immigrant to the United States and was born in Bangladesh.

83.     Mr. Islam has been employed by Lyft as a driver since 2014 until March 15, 2020, when he stopped working as a result of COVID-19, and was employed as a Juno driver from 2016 to 2019.

84.     Lyft and Juno have always reported Mr. Islam's earnings to him on Forms 1099.

85.     On March 24, 2020, Mr. Islam applied for UI by completing an online application on the DOL's website.

86.     The online application instructed Mr. Islam that he would need to complete the application over the phone with a DOL representative.

---

[5] *See*, REUTERS, *CDC warns second COVID-19 wave may be worse, arriving with flu season* (Apr. 21, 2020), available at https://www.reuters.com/article/us-health-coronavirus-usa-winter/cdc-chief-warns-second-covid-19-wave-may-be-worse-arriving-with-flu-season-idUSKCN2233E8 (Date accessed: May 24, 2020), attached as Appendix M.

87.     Upon information and belief, the DOL did not complete Mr. Islam's application at this time because it did not possess wage earnings data associated with his Social Security number, as it has not required these companies to provide their wage data for drivers.

88.     On March 27, 2020 Mr. Islam was able to speak to a DOL representative over the phone.  During this call, Mr. Islam explained that he worked for Lyft and Juno during the relevant time period, and the DOL representative told him that he needed to fax his 1099s and one sample weekly paystub from each company to the DOL.

89.     Mr. Islam faxed the requested documents to the DOL the following day.

90.     Anxious to receive any type of unemployment assistance after waiting over three weeks for benefits, on or about April 21, Mr. Islam submitted a new application for benefits, hoping that it would be processed as an application for PUA benefits.

91.     On April 27, Mr. Islam received an MBD, with a mailing date of March 30, which notified him that he did not have sufficient wages to establish a UI claim.  The MBD listed Lyft and Juno under the heading "employer name," but showed $0.00 earned from either company during the applicable period.

92.     On May 20, Mr. Islam received a message from the DOL, informing him that he was able to apply for PUA.

93.     On May 21, Mr. Islam applied for PUA, and considering his denial for UI, he responded on the PUA application that he had been self-employed.

94.     After responding that he was self-employed, the application then asked him what his net income in 2019 was, and to upload supporting documents such as 1099s and the Schedule C to his 2019 tax return.

95.     In 2019, Mr. Islam's net income was $30,336. By contrast, his gross income from Lyft alone for the four quarters considered in calculating his state UI benefit rate, was $51,542.19, with high quarter earnings of $14,716.83.

96.     Therefore, if Mr. Islam's application is routed through PUA rather than UI, he will receive a lower benefit rate, based on his net income, rather than on gross earnings paid by his employer, as required by the New York UI Law. *See*, N.Y. Labor Law § 518, U.I. Claimant Handbook, at 18, 20 (UI WBR to be calculated based on all remuneration or "gross" pay); 20 C.F.R. § 625.6(a)(2); April 27 PUA Guidance, at I-6 (PUA benefit rate to be based on a claimant's net income).

97.     Mr. Islam's UI benefit rate would be $504 per week, while, upon information and belief, his PUA benefit would only be $291.69 per week.

98.     Indeed, on May 22, Mr. Islam received an online notice that he had been approved for a weekly benefit rate of only $291.

99.     Mr. Islam has yet to receive any payment of any unemployment benefit.

100.    If Mr. Islam were to have received benefits within 2-3 weeks of his application date, as outlined in the UI Claimant Handbook, he would have begun to receive benefits between April 7 and April 14.

101.    The DOL's March 30 MBD, denying Mr. Islam's UI claim when the DOL had already procured wage data from him and was bound to follow its prior decisions on app-based drivers, has delayed the delivery of UI benefits by at least six weeks.

102.    Mr. Islam is the sole provider for himself, his wife, and three children, ages 18, 13, and 9 who live with him.

103.    Because he has not yet received benefits, Mr. Islam has been unable to pay his rent for April or May, nor any other bills that will come due.

104.    Currently, Mr. Islam has no income, no savings, and has a bank balance of negative $115.

105.    Mr. Islam has applied for food stamps, but has not yet been approved.

106.    Mr. Islam has only been able to afford groceries for his family by borrowing money from relatives, many of whom are unemployed themselves but have limited savings.  Mr. Islam does not know when he will be able to pay them back nor how long he will be able to continue borrowing money from relatives.

107.    Currently, Mr. Islam is receiving free food from a New York City program. Without this program, and assistance from relatives, Mr. Islam and his family would not have anything to eat.

108.    Further, Mr. Islam has been unable to pay his cell phone bill.  Because Mr. Islam uses his cell phone to receive dispatches as a Lyft driver, if his cell phone service is cut off due to non-payment, he would be unable to return to work, even when business returns and he would otherwise be available for work.

**PLAINTIFF DOH OUATTARA**

109.    Plaintiff Doh Ouattara is an immigrant to the United States and was born in the Ivory Coast.

110.    Mr. Ouattara has been employed by both Uber and Lyft as a driver since 2016 until March 18, 2020, when he stopped working as a result of COVID-19.

111. Uber and Lyft have always reported Mr. Ouattara's earnings to him on Forms 1099.

112. On April 1, 2020, Mr. Ouattara applied for UI by completing an online application on the DOL's website. On this application, Mr. Ouattara listed Uber as one of his employers.

113. The online application instructed Mr. Ouattara that he would need to complete the application over the phone with a DOL representative.

114. Upon information and belief, the DOL did not complete Mr. Ouattara's application at this time because it did not possess wage earnings data associated with his Social Security number, as it has not required these companies to provide their wage data for drivers.

115. For about two weeks, Mr. Ouattara called the DOL approximately five hundred (500) times per day, but was unable to reach a representative on the phone.

116. On or about April 14, 2020, Mr. Ouattara received a call from a DOL employee. During this call, the DOL representative asked Mr. Ouattara who he worked for, and Mr. Ouattara replied that he worked for Uber and Lyft.

117. The DOL representative replied, that because Mr. Ouattara worked as a driver for Uber, he would be considered self-employed, and not be considered an employee of Uber.

118. Mr. Ouattara told the DOL representative that he was aware of a case where the DOL had decided that New York Uber drivers were considered employees and had received state UI.

119. The DOL representative told Mr. Ouattara, "If you don't have a W2, you're not an employee, so I will put you down as self-employed."

120.    On May 13, Mr. Ouattara received an MBD with a mailing date of April 24 which notified him that he did not have sufficient wages to establish a UI claim. The MBD listed Uber Technologies under the heading "employer name," but showed $0.00 earned during the applicable period.

121.    On May 13, Mr. Ouattara submitted a request for reconsideration of his MBD to the DOL, which is still pending.

122.    On May 20, the DOL sent Mr. Ouattara a message telling him that he would be able to apply for PUA.

123.    On May 21, Mr. Ouattara submitted an application for PUA. On this application, Mr. Ouattara replied that he was not self-employed, and the application did not allow him to enter any information about his gross or net earnings.

124.    In 2019, Mr. Ouattara's net income was $25,883. By contrast, his gross Uber and Lyft income for the four quarters considered in calculating his state UI benefit rate was $55,508.28, with high quarter earnings of $18,405.43.

125.    Mr. Ouattara's UI benefit rate would be $504 per week, while, upon information and belief, his PUA benefit would only be $248.88.

126.    If Mr. Ouattara were to have received benefits within 2-3 weeks of his application date, as outlined in the UI Claimant Handbook, he would have begun to receive benefits between April 14 and April 21.

127.    Mr. Ouattara is the sole provider for himself and his three children, who are five years old, three years old, and five months old.

128.    Mr. Ouattara's family receives $326 per month in SNAP benefits.

129.     Because he has not yet received unemployment benefits, Mr. Ouattara has been unable to pay his May rent, and was only able to pay half of his full rent for the month of April.

130.     Mr. Ouattara is behind in his insurance payments for the for-hire vehicle he uses to work as an Uber and Lyft driver.

## PLAINTIFF ABDUL RUMON

131.     Plaintiff Abdul Rumon is an immigrant to the United States and was born in Bangladesh.

132.     Mr. Rumon has been employed by Uber and Lyft as a driver from 2016 until March 8, 2020 when he stopped working as a result of COVID-19.

133.     Uber and Lyft have always reported Mr. Rumon's earnings to him on Forms 1099.

134.     Additionally, Mr. Rumon worked part-time in a Subway restaurant during 2018 and 2019, where he was paid as an employee and his earnings were reported to him on a Form W-2.

135.     On March 20, 2020, Mr. Rumon applied for UI by completing an online application on the DOL's website.

136.     The online application instructed Mr. Rumon that he would need to complete the application over the phone with a DOL representative.

137.     Upon information and belief, the DOL did not complete Mr. Rumon's application at this time because it did not possess wage earnings data associated with his Social Security number, as it has not required companies such as Uber and Lyft to provide their wage data for drivers.

138.     After calling the DOL every day anywhere from 50-100 times a day, Mr. Rumon was able to speak to a DOL representative over the phone on April 1. During this call, Mr. Rumon explained that he worked for Subway part-time, but that most of his earnings came from driving for Uber and Lyft.

139.     The DOL representative told Mr. Rumon that he should receive unemployment based on his Uber and Lyft earnings, but that he would need to fax copies of his 1099s from Uber and Lyft to the DOL.

140.     The following day, Mr. Rumon went to a pharmacy and faxed the requested 1099s to the DOL. That same day, he also sent copies of the requested documents to the DOL via mail, and through a secure message on the DOL website.

141.     If Mr. Rumon were to have received benefits within 2-3 weeks of his application date, as outlined in the UI Claimant's Handbook, he would have begun to receive benefits between April 7 and April 14.

142.     Indeed, on April 9, Mr. Rumon did receive his first benefit payment, but at a weekly benefit rate of only $155, based solely on his earnings as a Subway employee.

143.     On or about April 10, Mr. Rumon received his MBD from the DOL, which only showed wages earned from Subway, and did not show any earnings for his employment with Uber and Lyft.

144.     Because the DOL ignored the UIAB's prior decisions on app-based drivers, and did not treat Mr. Rumon's earnings from driving as employment income, Mr. Rumon has received only a fraction of the UI benefits to which he is entitled.

145.    Had the DOL properly treated Mr. Rumon's Uber and Lyft earnings as wages earned in employment, he would have received his full benefits at least as early as he received his partial benefits.

146.    Mr. Rumon's gross Uber and Lyft income for the four quarters considered in calculating his state UI benefit rate totaled $72,037.54, with high quarter earnings of $16,309.24.

147.    If those Uber and Lyft earnings were properly considered in calculating his benefit rate, Mr. Rumon would receive the maximum weekly benefit rate of $504, instead of the $155 per week he is currently receiving.

148.    On or about April 15, Mr. Rumon submitted a request for reconsideration of his MBD to the DOL, which is still pending.

149.    Mr. Rumon's income was the sole support for himself, his wife, and his three children, ages one, two, and six years old.

### PLAINTIFF HARNEK SINGH

150.    Plaintiff Harnek Singh is an immigrant to the United States and was born in India.

151.    Mr. Singh has been employed by Uber as a driver from 2018 until March 9, 2020, when he stopped working as a result of COVID-19.

152.    Uber has always reported Mr. Singh's earnings to him on a Form 1099.

153.    On or about March 14, 2020, Mr. Singh applied for UI by completing an online application on the DOL's website.

154.    The online application instructed Mr. Singh that he would need to complete his application over the phone with a DOL representative.

28

155.     Upon information and belief, the DOL did not process Mr. Singh's application at this time because it did not possess wage earnings data associated with his Social Security number, as it has not required Uber to provide wage data for drivers.

156.     After trying for two weeks, Mr. Singh was finally able to reach a DOL claims specialist on March 31 to complete his UI application over the phone.  During this phone call, a DOL representative told Mr. Singh that the DOL had no records of his earnings, and that he would have to fax a copy of his 2019 Form 1099 listing his Uber earnings to the DOL.

157.     That same day, Mr. Singh faxed a copy of his Form 1099 to the DOL.

158.     On or about April 25, Mr. Singh received an MBD with a mailing date of April 1, which notified him that he did not have sufficient wages to establish a UI claim. The MBD listed Uber under the heading "employer name," but showed $0.00 earned during the applicable period.

159.     Anxious to receive any type of unemployment assistance after waiting six weeks for benefits, Mr. Singh submitted a new application for benefits, hoping that it would be processed as an application for PUA benefits.

160.     On April 29, Mr. Singh filed a request for reconsideration of his MBD, and submitted wage information to the DOL, as he had earned wages in employment through Uber.

161.     The DOL's April 1 denial of his UI claim, when the DOL had already procured wage data from Mr. Singh and was bound to follow the 2018 Uber UIAB decision, has delayed the delivery of benefits by at least seven weeks.

162.     Mr. Singh has not received any unemployment benefits yet, and it is unclear when he will receive the benefits he is due.

163. If Mr. Singh were to have received benefits within 2-3 weeks of his application date, as outlined in the UI Claimant's Handbook and on the official NY Department of Labor Twitter account, he would have begun to receive benefits between March 28 and April 4.

164. Further, if Mr. Singh's application is now routed through PUA rather than UI, he will receive a lower benefit rate, based on his net income, rather than on gross earnings paid by his employer, as required by the NY UI Law.

165. In 2019, Mr. Singh's net income was $36,156. By contrast, his gross Uber income for the four quarters considered in calculating his state UI benefit rate, was $84,321.56, with high quarter earnings of $25,613.91.

166. Mr. Singh's UI benefit rate would be $504 per week, while, upon information and belief, his PUA benefit would only be $347.65 per week.

## PLAINTIFF NYTWA

167. NYTWA works to ensure the fair treatment of its member drivers and to promote the dignity of all workers in the taxi, limousine, and Black Car industries in New York.

168. NYTWA counts at least half of its 23,000 members as app-based drivers. All Individual Plaintiffs are NYTWA members.

169. NYTWA staff assist members with issues related to their work in the for-hire transportation industry and also offer assistance to members who need other social services, for example, guiding workers through their claims for benefits such as Workers' Compensation.

170. Since 2016, NYTWA has devoted staff resources to challenging Uber's misclassification of its drivers as independent contractors for the purposes of unemployment insurance.

171.    More recently, NYTWA staff have spent significant time and resources in evaluating the Individual Plaintiffs' and many other drivers' claims for UI benefits, assisting drivers with the myriad and constantly evolving forms of the UI and PUA applications, and referring them to outside counsel.

172.    In particular, since the onset of the COVID-19 pandemic in New York City, the bulk of the NYTWA's work has been related to UI and PUA issues.  NYTWA staff have had to spend significant time and resources on UI and PUA issues because the DOL is not treating Uber and other app-based employers in a uniform and predictable manner, as required by the law and the DOL's own decisions regarding the employee status of app-based drivers.

173.    NYTWA staff have responded to hundreds of drivers experiencing delays and problems with their unemployment applications, most of which result from confusion around drivers' eligibility for PUA or UI, drivers' inability to complete their applications online, and the need to submit reconsideration requests, all of which result from the DOL's failure to straightforwardly apply its binding case law to Uber and other app-based drivers, and treat their applications as they would those of any other claimant working for a company already determined to be an employer under the UI law.

174.    The NYTWA's diversion of resources to the hundreds of members requiring assistance with an unnecessarily complicated UI process has diverted staff resources from vital organizational priorities such as combatting wage theft committed by app-based employers and taxi companies and seeking debt forgiveness for taxi drivers.

175.    The need to respond to drivers' immediate and pressing UI problems has even diverted NYTWA's staff time away from other vital member needs during the pandemic, such as

organizing for personal protective equipment for drivers who are still working and for all drivers when business returns, and even providing assistance to the families of recently deceased members.

176.    If the DOL properly processed Uber and Lyft drivers' UI applications in line with settled precedent, there would be very little need for NYTWA to become involved: drivers would file for UI, the DOL would determinate a benefit rate based on earnings data provided by employers, and drivers would receive benefits in their bank accounts in two to three weeks. Instead, NYTWA staff must help shepherd hundreds of drivers through a constantly evolving process in which drivers are being instructed to fill out several versions of both UI and PUA forms, with no clear understanding of how or when the DOL will process their claims.

177.    Many of NYTWA's app-based driver members are suffering from food insecurity and are unable pay for groceries, internet or telephone bills as they have yet to receive any unemployment benefits, despite the fact that many of them filed for UI eight weeks ago or earlier.  Many of these members are not US citizens or permanent residents, and are concerned that applying for food stamps could permanently affect their future eligibility for citizenship or their right to stay in the country legally under the so-called "public charge" rule.  Many NYTWA members have reported that they are unable to make vehicle payments since the pandemic began and are concerned that if they default on payments, their vehicles could be repossessed, destroying their credit and making it more difficult to get other work vehicles in the future.

178.    NYTWA's work on UI and PUA issues will not end when the current wave of COVID-19 infections subsides in New York.  To assist members, NYTWA will continue to advocate for drivers' right to regular UI, which will outlast the application of PUA in New York.

179.    Further, given the potentially cyclical nature of COVID-19, should another wave of the virus affect the City and, should PUA be re-authorized at a later date, with drivers needing to re-apply for benefits, NYTWA will again face this burden on its resources if the DOL does not start processing Uber and Lyft drivers' UI claims in accordance with law.

**FIRST CAUSE OF ACTION**
**VIOLATION OF "WHEN DUE" CLAUSE PURSUANT TO 42 U.S.C. § 1983**

180.    Plaintiffs reallege and incorporate by reference all allegations contained in the preceding paragraphs.

181.    Defendants are refusing to process claims for UI and to provide benefits for Individual Plaintiffs and all former drivers for Uber, Lyft, and app-based FHV companies in a timely manner as it does employees of other companies determined to be employers by New York State.  If they had been treated as employees, as required by the controlling precedent, Individual Plaintiffs should have received their full benefits between March 28 and April 9; instead, none of them have yet received any benefit payments related to their earnings as drivers.

182.    Title III of the Social Security Act of 1935, 42 U.S.C. §§501-504 and 20 C.F.R. § 640.3(a) require that state unemployment compensation laws provide for such methods of administration as will reasonably insure the full payment of unemployment benefits to eligible claimants when due and with the greatest promptness that is administratively feasible.

183.    By failing to collect earnings data from app-based companies determined to be employers, by requiring Individual Plaintiffs and other drivers to provide proof of earnings, and by denying Individual Plaintiffs and all app-based drivers UI benefits based on their earnings from app-based FHV work, Defendants have failed to ensure the full payment of UI benefits

when due and with the greatest promptness that is administratively feasible. Therefore, the Defendants are violating 42 U.S.C. §§501-504 and 20 C.F.R. § 640.3(a), thus creating a privately enforceable cause of action pursuant to 42 U.S.C. § 1983.

184. Defendants' violations of the Social Security Act and regulations have caused Plaintiffs injury, including irreparable injury, which will continue unless Defendants are enjoined from their unlawful conduct.

185. As a result of the Defendants' violation of 42 U.S.C. §§501-504 and 20 C.F.R. § 640.3(a), the Court should order that the Defendants immediately issue UI benefits to Individual Plaintiffs and all app-based FHV driver claimants utilizing the earnings from their app-based FHV employers.

## SECOND CAUSE OF ACTION
## VIOLATION OF EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C § 1983

186. Plaintiffs reallege and incorporate by reference all allegations contained in the preceding paragraphs.

187. New York employers who are liable for unemployment insurance contributions or for payments in lieu of such contributions pursuant to article eighteen of the labor law, must file wage reporting information on a quarterly basis. N.Y. Tax Law § 674(a)(4)(A).

188. The employment status of app-based drivers for New York unemployment insurance purposes is settled law. App-based drivers and workers with similar working conditions have been determined to be employers with respect to unemployment insurance benefits by the UIAB and the New York Court of Appeals, respectively.

189.     Despite these determinations, Defendants persist in processing UI claims by Plaintiffs and other former app-based FHV drivers as though their employee classification were still in question.

190.     The MBDs issued by Defendants for Individual Plaintiffs and for all app-based FHV drivers do not include their earnings from Uber, Lyft, and/or any FHV app-based company because most, if not all, such companies fail to report the earnings of their employees to Defendants.  As a result, former app-based FHV driver claimants are initially determined by Defendants to be ineligible for UI or, if they do establish monetary eligibility, their monetary benefit rates do not reflect the earnings from their former FHV app employers.

191.     In order for their earnings to be considered for purposes of monetary eligibility, the Individual Plaintiffs and all former app-based FHV drivers must go through a cumbersome and lengthy reconsideration process. This delays their monetary eligibility and receipt of benefits by months.

192.     Under the Fourteenth Amendment, Section 1 of the Constitution of the United States, no state shall deny to any person within its jurisdiction the equal protection of the laws.

193.     As a result of Defendants' differential enforcement of the Labor Law, Plaintiffs and similarly situated drivers face months of delay after completing their initial applications for unemployment benefits since the DOL does not have their wage information on hand. Defendants' failure to enforce wage reporting labor laws against app-based FHV companies in violation of their own administrative decisions and that of the highest court of New York has no rational relationship to a legitimate government interest and thus denies Plaintiffs equal protection of the laws.

194. By denying Plaintiffs equal protection, Defendants' conduct has caused Plaintiffs injury, including irreparable injury, which will continue unless Defendants are enjoined from their unlawful conduct.

195. As a result of the Defendants' violation of Fourteenth Amendment, Section 1 of the Constitution of the United States, the Court should order that the Defendants immediately issue UI benefits to Individual Plaintiffs and all former app-based FHV driver claimants.

## REQUEST FOR RELIEF

196. Plaintiffs have no adequate remedy at law to redress the wrongs set forth in this Complaint.

197. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the Defendants' acts and omissions as alleged herein, unless this Court grants the relief requested.

WHEREFORE, Plaintiffs request that this Court enter a final judgment:

(1) Prohibiting Defendants from misclassifying app-based drivers as independent contractors and issuing incorrect $0 MBDs to all app-based drivers in violation of Title III of the Social Security Act of 1935 and the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

(2) Enjoining the Defendants to immediately pay UI benefits to Individual Plaintiffs and all app-based driver claimants in New York State, as required by Title III of the Social Security Act of 1935 and the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

(3)     Enjoining the Defendants to require Uber, Lyft, other app-based FHV employers in New York State to provide driver earnings data to New York State, as required by Title III of the Social Security Act of 1935 and the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

(4)     Declaring that Defendants' actions in failing to pay UI benefits to Individual Plaintiffs and all app-based FHV driver claimants in New York State, in accordance with settled precedent, violate Title III of the Social Security Act of 1935, 42 U.S.C. §§501-504 and the United States Constitution;

(5)     Awarding reasonable attorneys' fees, together with costs and disbursements; and

(6)     Granting such other and further relief as the Court may deem just and proper.


Dated: May 25, 2020
       Brooklyn, NY

                                   Respectfully submitted,



                                   _____
                                   BROOKLYN LEGAL SERVICES
                                   Attorneys for Plaintiffs
                                   105 Court Street, 3rd floor
                                   Brooklyn, NY  11201
                                   (718) 237-5544

                            BY:    Nicole Salk

ZUBIN SOLEIMANY, Esq.
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892