UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MD ISLAM, DOH OUATTARA, ABDUL
RUMON, HARNEK SINGH, and NEW YORK
TAXI WORKERS ALLIANCE,

                                    Plaintiffs,

                    v.

ANDREW CUOMO, GOVERNOR OF THE
STATE OF NEW YORK, THE NEW YORK
STATE DEPARTMENT OF LABOR, and
ROBERTA REARDON, as COMMISSIONER OF
LABOR,

                                    Defendants.

**MEMORANDUM AND ORDER**

20-CV-2328 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

MD Islam, Doh Ouattara, Abdul Rumon, and Harnek Singh (collectively "Individual

Plaintiffs"), and New York Taxi Workers Alliance ("NYTWA") bring the instant action pursuant

to 42 U.S.C. § 1983 against Andrew Cuomo, Governor of New York; the New York Department

of Labor ("NYDOL"); and Roberta Reardon, Commissioner of Labor; alleging violation of Title

III of the Social Security Act of 1935, 42 U.S.C. *et seq.* § 501 and the Equal Protection Clause of

the Fourteenth Amendment of the U.S. Constitution for failure to pay unemployment insurance

benefits when due.  Plaintiffs move pursuant to Rule 65 of the Federal Rules of Civil Procedure

for a preliminary injunction:  (1) enjoining Defendants to immediately pay unemployment

insurance benefits to Individual Plaintiffs and all app-based For-Hire Vehicle ("FHV") driver

claimants ("FHV claimants"); (2) enjoining Defendants to require app-based FHV employers

doing business in New York to provide wage and earnings data to New York State or, in the

alternative, enjoining the NYDOL to create a streamlined process through which it can

1

immediately determine monetary eligibility for unemployment insurance benefits of all FHV

claimants by allowing such claimants to self-attest to their gross quarterly earnings; and (3)

granting such other and further relief as the Court may deem just and proper.

**BACKGROUND**[1]

## I.   Administrative Framework for Issuance of Unemployment Insurance Benefits

All federal-state cooperative unemployment insurance programs are financed in part by

grants from the United States pursuant to the Social Security Act.  States are eligible to receive

payments to finance the administration of their unemployment insurance programs only after the

Secretary of Labor certifies that "[their] programs provide for such methods of administration . . .

as are found by the Secretary of Labor to be reasonably calculated to insure full payment of

unemployment compensation *when due* . . . ."  42 U.S.C. § 303(a)(1) (emphasis added).  This

provision is commonly known as the "when due" clause.

Echoing the language from the Social Security Act, the federal implementing regulations

require state unemployment insurance programs to provide for "such methods of administration

as will reasonably ensure the full payment of unemployment benefits to eligible claimants with

the greatest promptness that is administratively feasible."  20 C.F.R. § 640.3(a).  To that end, the

regulations demand that the state "obtain promptly and prior to a determination of an individual's

right to benefits, such facts pertaining thereto as will be sufficient reasonably to insure the

payment of benefits when due."  *Id*. Part 602, App. A, Section 6013(A).  This requirement

embraces five separate elements, which, *inter alia*, place the responsibility of initiating discovery

---

[1] The following findings of fact are taken from the declarations in support of the parties' memoranda of law, the preliminary injunction hearing held on July 2, 2020; July 13, 2020; and July 16, 2020, and public sources, of which the Court takes judicial notice.  In taking judicial notice of certain documents, the Court looks only to what statements the documents contain and "not for the truth of the matter asserted."  *Beauvoir v. Israel*, 794 F3d 244, 248 n.4 (2d Cir. 2015)

of necessary information on the state agency, permit the state agency to obtain the necessary information from the worker, the employer, or other sources, and provide that any state agency investigation should not be so exhaustive and time-consuming as to unduly delay the payment of benefits. *Id*.

At the state level, to facilitate the issuance of unemployment benefits, New York Labor Law requires, among other things, that an employer "keep a true and accurate record of each person employed by him . . . and the amount of remuneration paid to each . . . ." N.Y. Labor Law § 575. Moreover, an employer is required to "file a quarterly combined withholding, wage reporting and unemployment insurance return . . . and such other related information as the commissioner of taxation and finance or the commissioner of labor, as applicable, may prescribe." N.Y. Tax Law § 674(a)(4)(A).

Critically, the NYDOL uses wage and earnings data to assess whether a claimant qualifies for unemployment insurance benefits. *See* N.Y. Labor Law § 527; (June 17, 2020 Decl. Laura Campion ("Campion Decl.") ¶¶ 2–5, ECF No. 12-1.) Indeed, the NYDOL's current practice is to, in the first instance, rely on wage and earnings data submitted by employers—to the exclusion of other sources—to make initial eligibility determinations. (*See* July 13, 2020 Prelim. Inj. Hr'ng Tr. ("July 13 Tr.") 27:4–13.) Once an initial eligibility determination is made, the NYDOL provides a notice to claimants through a Monetary Benefit Determination ("MBD"), which includes a determination of eligibility or ineligibility for benefits, the wages that the NYDOL used to calculate benefits, and the determined weekly benefit amount for the claimant. (Campion Decl. ¶ 5.) The maximum weekly benefit rate is $504.[2] *See* N.Y. Dep't Labor

---

[2] Weekly unemployment insurance benefits are calculated in accordance with New York Labor Law § 590(5), which establishes the rate as one twenty-sixth of the high quarter wages paid in a claimant's base period, except if the claimant's high quarter wages are three-thousand, five hundred and seventy five dollars or less, the weekly benefit rate is one twenty-fifth of the high quarter wages. *See* N.Y. Labor Law §590(5). Additionally, if a claimant only has

Unempl. Ins. Handbook VIII (2020), https://www.labor.ny.gov/formsdocs/ui/TC318.3e.pdf.

When wage and earnings data is not provided to the NYDOL by the employer, a claimant's

MBD is assessed at $0.00 in earnings, rendering the claimant ineligible to receive unemployment

insurance benefits.  (*See* June 17, 2020 Decl. Diane M. Taylor ("Taylor Decl.") ¶¶ 9–10, ECF

No. 12-4; *See* July 14, 2020 Suppl. Decl. Stephen Geskey ("Suppl. Geskey Decl.") ¶ 8, ECF No.

19-4.)

Where a claimant seeks to challenge an initial determination, the burden shifts to the

claimant to request reconsideration.  *See* N.Y. Labor Law § 620(1)(a) ("A claimant who is

dissatisfied with an initial determination of his or her claim for benefits or any other party,

including any employer . . . may, within thirty days after the mailing or personal delivery of

notice of such determination, request a hearing.").  At this juncture, the claimant may provide

additional source information in support of his or her claim, including Form 1099-MISC ("1099

tax form") and Form 1040 ("1040 tax form").  (*See* July 13 Tr. 24:25–25:9.)  If the NYDOL

determines, based upon the information provided by the claimant, the employer, or a

combination thereof, that additional wages should have been included in the calculation of the

weekly benefit, then the weekly benefit is recalculated, and a new MBD is issued.  *See* UI

Handbook at 11.  A claimant may request a referee's hearing regarding any adverse

determination, including for any adverse determination associated with the initial MBD or a

request for reconsideration.  *See generally* N.Y. Labor Law § 620; N.Y. Dep't Labor Unempl.

Ins. Handbook VI-VIII, 34-36.  In the event that of an adverse decision to the claimant, the

claimant may appeal that decision to the New York State Unemployment Insurance Appeals

Board (the "UIAB") by filing notice of appeal within twenty days of the decision.  N.Y. Labor

---

two or three quarters of earnings in their base period, and the high quarter is greater than four thousand dollars, the high quarter wages will be calculated based on the average of claimant's two highest quarters. *Id.*

Law § 621(1); (Campion Decl. ¶ 18.)  If the UIAB renders a decision adverse to the claimant, the claimant may then appeal the UIAB's decision to the New York State Appellate Division of the Supreme Court, Third Department.  N.Y. Labor Law § 624; (Campion Decl. ¶ 19.)  Employers too share this right to appeal.  (*See* Campion Decl. ¶ 23.)  The statutes do not prescribe a time frame in which these appeals must be resolved.  *See* N.Y. Labor Law §§ 620–626.  In the case of certain Individual Plaintiffs, the reconsideration process took nearly three months.  (*See* Suppl. Geskey Decl. ¶¶ 23–27.)

By contrast, according to the NYDOL, if a claimant is eligible for benefits, "[their] first payment will generally be made two to three weeks from the time [they] file [their] claim."  N.Y. Dep't Labor Unempl. Ins. Handbook 14.

## II.     App-Based FHV Companies[3]

As early as 2016, the NYDOL determined that three Uber driver claimants, employed between November 2015 and August 2016; in April 2016; and between August 2014 and September 2015, respectively, and those similarly situated to them were employees of Uber for the purpose of unemployment insurance benefits.  *See In the Matter of Uber Technologies, Inc*., UIAB Nos. 596722–596727 (Jul. 12, 2018) at 1, 7 (citing specific determinations made by the NYDOL).  In 2018, the UIAB affirmed those determinations.  *Id*. at 10.  Nonetheless, Uber and other app-based FHV companies have, by and large, maintained that drivers since then are self-employed.  (*See* July 2, 2020 Prelim. Inj. Hr'ng Tr. 28:10–29:20.)  Consistent with that position, app-based FHV companies have not universally provided driver wage and earnings data to the NYDOL.  (*See id*. at 26:2–6, 64:8–20.)  Moreover, where the NYDOL has made individual

---

[3] For the purpose of this memorandum and order, app-based FHV companies are defined as those companies that provide pre-arranged transportation to passengers under a super class of licenses issued by the Taxi & Limousine Commission ("TLC").  *See* NYC Taxi & Limousine Commission, *For-Hire Vehicle Bases*, (2020), https://www1.nyc.gov/site/tlc/businesses/for-hire-vehicle-bases.page.  This includes Uber, Lyft, Via, and Juno.

determinations that FHV claimants are employees entitled to unemployment insurance benefits, app-based FHV companies have often appealed those determinations.  For example, there have been approximately, 294 cases where NYDOL has determined the Uber is an employer and Uber has appealed 227 of those cases.  (July 6, 2020 Decl. of Stephen Geskey ("Geskey Decl.") ¶ 16.)  There have been approximately 78 cases where the NYDOL determined Lyft to be an employer, and Lyft has challenged that determination in 11 cases.  (*Id*. ¶ 14.)  And, there have been approximately 11 cases where the NYDOL determined Juno to be an employer, and Juno has challenged 9 of those determinations.  (*Id*. ¶ 15.)  Further complicating this process, app-based FHV companies often abandon these appeals—Uber abandoned 204 of its 227 appeals, Lyft abandoned 9 of its 11 appeals, and Juno abandoned 3 of its 9 appeals.  (*Id*. ¶¶ 14–16.)  Appeals involving each of these companies remain pending.  (*Id*.)

As with all employers, if after a final determination, an app-based FHV employer fails to file a combined withholding wage reporting and/or an unemployment insurance return, or if the filing is incomplete, the Commissioner of Labor is required to determine the amount of wages paid by the employer on the basis of information as may be available.  (*See id*. ¶ 4.)  To ensure the accuracy of this assessment, the NYDOL may conduct an audit of the employer.  (*See id*. ¶¶ 17–32.)  Notably, the status of any outstanding administrative hearing impacts the NYDOL's pursuit of an audit against that app-based FHV company.  (*Id*. ¶ 9.)  As a matter of practice,

where an employer abandons a hearing while pursuing others, a tactic app-based FHV companies often employ, the NYDOL will wait to pursue action.  (*Id.* ¶ 10.)

## III.     The Plaintiffs

### A.     MD Islam

Islam was employed by Lyft as a driver from 2014 until March 15, 2020, when he was forced to stop working as a result of COVID-19.  (May 23, 2020 Decl. of MD Islam "Islam Decl." ¶ 3, ECF No. 7-2.)  He was previously employed by Juno as a driver from 2016 to 2019. (*Id.*)  Lyft and Juno have reported Islam's earnings on 1099 tax forms.  (*Id.* ¶ 4.)

On March 24, 2020, Islam applied for unemployment insurance benefits.  (*Id.* ¶ 6.)  On March 27, 2020, a NYDOL representative informed Islam by phone that he needed to fax his 1099 tax form along with one sample weekly paystub from each of his employers.  (*Id.* ¶ 8.) Islam faxed the requested documents to the NYDOL the following day.  (*Id.* ¶ 9.)  On April 27, 2020, Islam received notice that he was ineligible for unemployment insurance benefits based upon a March 30, 2020 MBD showing $0.00 in earnings.  (*Id.* ¶ 11.)  On April 28, 2020, Islam filed a request for reconsideration.  (Taylor Decl. ¶ 12.)  At the time the complaint was filed on May 25, 2020, Islam had no income, no savings, and had not received any payment of unemployment insurance benefits.  (Islam Decl. ¶¶ 15, 19.)

### B.     Doh Ouattara

Ouattara was employed by both Uber and Lyft as a driver from 2016 until March 18, 2020 when he was forced to stop working as a result of COVID-19.  (May 24, 2020 Decl. of Doh Ouattara ("Ouattara Decl.") ¶ 3, 5, ECF No. 7-3.)  Uber and Lyft have reported Ouattara's earnings on 1099 tax forms.  (*Id.* ¶ 4.)

On April 1, 2020, Ouattara applied for unemployment benefits.  (*Id.* ¶ 6.)  On or about April 14, 2020, a NYDOL employee informed Ouattara that because he worked as a driver for Uber, he would be considered self-employed.  (*Id.* ¶ 9.)  On May 13, 2020, Ouattara received notice that he was deemed ineligible for unemployment benefits based upon an April 24, 2020 MBD showing $0.00 in earnings.  (*Id.* ¶ 10.)  The same day, he filed a request for reconsideration, along with records showing his earnings from Uber and Lyft.[4]  (*Id.* ¶ 11.) At the time the complaint was filed on May 25, 2020, Ouattara had no income, no savings, and had not received any payment of unemployment benefits.  (*Id.* ¶¶ 16, 17.)

### C.  Abdul Rumon

Rumon was employed by Uber and Lyft as a driver from 2016 until March 8, 2020 when he was forced to stop working as a result of COVID-19.  (June 22, 2020 Decl. of Abdul Rumon ("Rumon Decl.") ¶ 3, 6, ECF No. 13-1.)  Uber and Lyft have reported Rumon's earnings on 1099 tax forms.  (*Id.* ¶ 4.)  Additionally, Rumon worked part-time at Subway during 2018 and 2019, where his earnings were reported on a Form W-2.  (*Id.* ¶ 5.)

On March 20, 2020, Rumon applied for unemployment insurance benefits.  (*Id.* ¶ 7.)  On April 1, 2020, an NYDOL representative informed Rumon that he should receive unemployment insurance benefits based on his Uber and Lyft earnings, but that he would need to fax copies of his 1099 tax forms from Uber and Lyft to the NYDOL.  (*Id.* ¶ 9–10.)  Rumon faxed the requested forms the following day.  (*Id.* ¶ 11.)

On April 9, 2020, Rumon received his first unemployment insurance benefit payment, but at a weekly benefit rate of only $155—based solely on his earnings from Subway.  (*Id.* ¶ 12.)

---

[4] According to Ouattara, on May 13, 2020, he submitted a request for reconsideration of his MBD to the NYDOL. (Ouattara Decl. ¶ 11.)  However, according to Defendants, the NYDOL has no record that he filed such a request. (Taylor Decl. ¶ 12.)

On or about April 10, 2020, Rumon received his MBD from the NYDOL, which only showed wages earned from Subway and did not reflect any earnings for his employment with either Uber or Lyft. (*Id*. ¶ 13.) On April 15, 2020, Rumon filed a request for reconsideration of his MBD to the NYDOL, which was still pending at the time the complaint was filed on May 25, 2020. (*Id*. ¶ 14; *see also* Taylor Decl. ¶ 12.) At the time the complaint was filed on May 25, 2020, Rumon was only receiving $155 in weekly unemployment insurance benefits. (Rumon Decl. ¶ 22.) Rumon is the sole provider for his wife and three minor children. (*Id*. ¶ 16.) $155 per week amount does not cover their most basic expenses. (*Id*. ¶ 23.)

### D.   Harnek Singh[5]

On or about March 23, 2020, Singh applied for unemployment insurance benefits. (*See* Taylor Decl. ¶ 3, Table A.) Singh identified on his application that he had performed work during the base period for an app-based FHV company. (*Id*. ¶¶ 5, 9.) The app-based FHV company did not consider Singh an employee and did not report Singh's earnings as wages. (*Id*. ¶ 9.) On April 1, 2020, Singh was issued an MBD showing $0.00 in earnings, rendering him ineligible to receive unemployment insurance benefits. (*Id*. ¶¶ 7–8.) On April 28, 2020, Singh filed a request for reconsideration of his MBD. (*Id*. ¶ 12.) Singh was issued a new monetary determination with the maximum rate of $504 as of July 13, 2020. (Gesky Suppl. Decl. ¶¶ 24–26.)

### E.   NYTWA

NYTWA is a not-for-profit membership-based organization for New York City Taxi and Limousine Commission ("TLC") licensed drivers. (May 28, 2020 Decl. Bhairavi Desai ¶ 1, ECF No. 7-4.) Founded in 1998, the organization has more than 23,000 members, and approximately

---

[5] The Court notes that Plaintiffs failed to provide a declaration as to Harnek Singh. The Court's findings of fact as to Singh are therefore limited and derive from the declarations submitted by Defendants.

half of them drive for app-based FHV companies including Uber, Lyft, and Via.  (*Id.* ¶ 2.)
Traditionally, NYTWA provides a broad range of services for its members including:  discount
representation for DMV tickets and TLC matters; advocacy for victims of crime and wage theft;
and assistance applying for low-interest loans, life insurance, health insurance, disability and
workers compensation, and other benefits programs (including unemployment insurance
benefits).  (*Id.* ¶ 3.)  The organization also runs advocacy campaigns for law and regulatory
changes at the local, state, and federal levels, which seek to protect the long-term interests of
drivers.  (*Id.*)

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy never awarded as of right."
*Benisek v. Lamone*, 138 S. Ct. 1942, 1943, 201 L. Ed. 2d 398 (2018) (per curiam) (internal
quotations and citation omitted).  "A party seeking a preliminary injunction must show (1)
irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the
merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary
injunction is in the public interest."  *N. Am. Soccer League, LLC v. United States Soccer Fed'n,
Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  Where, as here, plaintiffs seek a mandatory injunction—
one that "alter[s] the status quo by commanding some positive act"—a higher standard applies.
*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).  Plaintiffs
seeking a mandatory injunction must show "a clear or substantial likelihood of success on the
merits."  *N.Y. Civil Liberties Union v. N.Y.C. Trans. Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).
The "'clear' or 'substantial' showing requirement . . .  alters the traditional [preliminary
injunction] formula by requiring that the movant[s] demonstrate a greater likelihood of success."
*Tom Doherty Assocs.*, 60 F.3d at 34.

10

**DISCUSSION**

This case comes before the Court as our nation is in the midst of an unprecedented health crisis.  Since the outbreak of the COVID-19 pandemic, workers across the nation have faced layoffs and furloughs at numbers rivaling those during the Great Depression.  *See* Heather Long and Andrew Van Dam, *U.S. unemployment rate soars to 14.7 percent, the worst since the Depression era*, N.Y. Times (May 8, 2020), https://www.washingtonpost.com/business/2020/05/08/april-2020-jobs-report/.  The State of New York has not been immune.  Since mid-March, the state has received more than 1.6 million unemployment insurance claims.  *See* Patrick McGeehan, *'I Cry Night and Day': How It Took One Woman 8 Weeks to Get Unemployment*, (May 8, 2020), https://www.nytimes.com/2020/05/08/nyregion/unemployment-benefits-ny-coronavirus.html; (*see generally* June 17, 2020 Decl. Yvonne Martinez, ECF 12-3.)  The state has by and large met this challenge, as officials have undertaken tremendous efforts to deliver benefits to its citizens, notwithstanding that doing so has strained the state's resources.  (*See generally* June 17, 2020 Decl. of John Dougherty ("Dougherty Decl."), ECF No. 12-2.)  These efforts are laudable.  Yet, the issues that give rise to Plaintiffs' claims far predate the current circumstances that we as a nation find ourselves.  The COVID-19 pandemic has served only to exacerbate the problem, and it must be remedied.

**I.      Plaintiffs Will Suffer Imminent Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations and citation omitted).  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an

injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations and citation omitted). Significantly, Plaintiffs need only show "a threat of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

It has long been recognized that protracted denial of subsistence benefits constitutes irreparable harm. *See Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995) (finding irreparable harm where New York City regularly failed to provide "aid continuing" benefits, in violation of federal and state law), *amended*, 94-CV-4415, 1996 WL 627730 (S.D.N.Y. Mar. 15, 1996). To indigent persons, the loss of even a portion of subsistence benefits results in injury that cannot be rectified through the payment of benefits at a later date. *See id.* (collecting cases). The reason for this should be obvious. Subsistence benefits by definition are those that provide for the most basic needs. As such, when the outright denial or undue delay in the provision of subsistence benefits is at issue, courts have not hesitated to utilize the extraordinary remedy of preliminary injunctive relief. *See, e.g.*, *Willis v. Lascaris*, 499 F. Supp. 749, 759–60 (N.D.N.Y. 1980) (enjoining reduction in food stamp allowances); *Hurley v. Toia*, 432 F. Supp. 1170, 1176–78 (S.D.N.Y. 1977) (granting preliminary injunction and staying enforcement regulation authorizing termination or reduction of public assistance benefits prior to affording hearing), *aff'd*, 573 F.2d 1291 (2d Cir. 1977); *Boddie v. Wyman*, 323 F. Supp. 1189, 1193 (N.D.N.Y. 1970) ("There is no doubt . . . that the differences sought in payments by the plaintiff are extremely important in respect to these things daily and in that sense when the day passes the injury or harm that may occur is irreparable."), *aff'd*, 434 F.2d 1207 (2d Cir. 1970), *aff'd*, 402 U.S. 991, 91 S.Ct. 2168, 29 L. Ed. 2d 157 (1971).

That unemployment insurance benefits fall into the category of subsistence benefits cannot be credibly disputed.  Indeed, the vitalness of unemployment insurance benefits is codified in New York Labor Law, which recognizes that "[e]conomic insecurity due to unemployment is a serious menace to the health, welfare, and morale of the people of this state." N.Y. Labor Law § 501.  This is all the more true against the backdrop of the current health crisis ravaging this nation—a crisis which has led to almost unprecedented unemployment across various sectors, including the app-based FHV industry.

According to Plaintiffs, unemployment insurance benefits due to FHV claimants have been delayed or altogether denied by systemic failures at the NYDOL, in violation of the "when due" clause of the Social Security Act.  For the reasons, discussed in full in section II *infra*, the Court agrees.  Without unemployment insurance benefits, Individual Plaintiffs and other app-based FHV members of NYTWA will be unable to meet their basic needs including, among other things, paying for groceries, housing, car insurance, and phone bills.  (*See* Rumon Decl. ¶¶ 24–32; Islam Decl. ¶¶ 20–26; Ouattara Decl. ¶¶ 15–21.).  The economic realities of an FHV claimant are set out in heart-wrenching detail in the declarations of Individual Plaintiffs.

The consequence of these delays and denials has had a cascading effect upon NYTWA.  Non-profit organizations are deemed to suffer irreparable harm when governmental action forces them to divert resources away from their organizational missions.  *See Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (granting preliminary injunction where federal government's implementation of rule hindered immigrant advocacy groups' ability to carry out their missions and force them to "expend substantial resources to mitigate its potentially adverse effects"); *Step By Step, Inc. v. City of Ogdensburg,* 176 F. Supp. 3d 112, 134–35 (N.D.N.Y. 2016) (granting preliminary injunction where, as a result of a municipality's

zoning law, "plaintiff's goal of providing housing and services to those suffering from mental illness [was] thwarted by each passing day") (internal quotations omitted).  Such is the case with respect to NYTWA.[6]

NYTWA has more than 23,000 members and approximately half of them drive for app-based FHV companies, including Uber, Lyft, and Via.  (Desai Decl. ¶ 2.)  Traditionally, the organization provides a broad range of services for its members including advocacy campaigns, assisting workers to combat wage theft by employers, and assisting workers applying for benefits programs.

At least 85% of the app-based members who have recently requested help from NYTWA have applied for unemployment insurance benefits.  (Desai Decl. ¶ 11.)  The vast majority of these members have not received the full amount of benefits to which they are entitled.  (*See* Sec. Suppl. Decl. Bhairavi Desai ("Desai Sec. Suppl. Decl.") ¶ 3, ECF No. 18-1.)  As a consequence, NYTWA staff have spent considerable resources and time counseling members who drive for app-based FHV companies to assist them with obtaining unemployment insurance benefits, including navigating the request for reconsideration process.  (Desai Decl. ¶ 21; June 22, 2020 Bhairavi Desai Suppl. Decl. ¶ 5, ECF No. 13-2; *see also* July 15, 2020 Decl. Ibrahim Diallo ¶ 6

---

[6] The Court is not persuaded by Defendants' attempt to distinguish the cases cited by Plaintiff on this point.  (*See* Defs.' Third Supp. Br. 1–3, ECF No. 21 (attempting to distinguish *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) and *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 134–35 (N.D.N.Y. 2016).)  With respect to *Make the Rd. New York*, Defendants first argue that the case is inapposite because there, the plaintiffs sought a prohibitive injunction and here, Plaintiffs seek a mandatory injunction.  Relying on a case issued out of the Southern District of New York, Defendants contend that where a plaintiff seeks a mandatory injunction, a heightened standard of irreparable harm applies.  Not necessarily so.  As the Second Circuit has stated, a mandatory injunction should issue "upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary."  *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 34 (2d Cir. 1995).  As the Court has already indicated and as will discuss at length later in this opinion, Plaintiffs have made a clear showing that they are entitled to relief.  No heightened standard for irreparable harm applies.  Defendants next argue that NYTWA has not offered "declarations extensively describing and calculating" the diversion resources that were the "direct and inevitable consequence of the impending implementation of the [immigration] Rule" as relied upon by the Court.  *Make the Rd. New York*, 419 F.Supp.3d at 665.  The Court simply disagrees.

ECF No. 20-1.)  For example, since March 23, 2020, the organization has responded to over 4,000 phone calls and 1,000 emails from members needing guidance related to unemployment insurance benefits.  (Desai Decl. ¶ 6.)  NYTWA staff have also had to conduct regular online workshops to address drivers' unemployment issues.  (*See* Desai Sec. Suppl. Decl. ¶ 4.)  Time spent assisting app-based members with their unemployment insurance claims during the COVID-19 pandemic has diverted staff resources from other traditional organizational priorities such as combatting wage theft by employers, seeking debt forgiveness for taxi drivers, organizing for personal protective equipment for drivers, and providing assistance to the families of recently deceased members.  (Desai Decl. ¶¶ 21–22.)

Put simply, the Court is convinced that the NYDOL's denial or delay of unemployment benefits to FHV claimants is sufficient to establish irreparable harm to Plaintiffs.

Defendants seek to avoid this finding by arguing that Individual Plaintiffs' claims of harm have been addressed since the filing of the complaint.  (Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n") 9–10, ECF No. 12.)  That is, since the filing of the action, Individual Plaintiffs are now receiving the maximum amount of benefits allowed under law either through unemployment insurance or other governmental programs.  (*Id.*)  In effect, according to Defendants, Individual Plaintiffs' claims are moot.  Not so.  As a threshold matter, an action will not be deemed moot where the voluntary cessation of the complained-of conduct occurred after filing, and the party can be reasonably expected to repeat the offensive conduct in the future.  *See De Funis v. Odegaard*, 416 U.S. 312, 318 (1974) (collecting cases); *Morel*, 927 F. Supp. at 635 (rejecting argument that plaintiffs' claims are moot because they have received either aid continuing benefits or a notice of decision following a hearing).  Moreover, an issue will not be

deemed moot if it is "capable of repetition yet evading review." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976, 195 L. Ed. 2d 334 (2016). Such is the case here.

Unemployment insurance benefits, once granted, are not necessarily static. Claims for benefits are subject to appeal from the employer, which could result in the denial of future benefits. (*See* Campion Decl. ¶ 23.) And, every claimant is required to certify weekly that they are unemployed and meet the eligibility requirements to continue receiving benefits. (*See* July 16, 2020 Prelim. Inj. Hr'ng Tr. 5:3–7:10.) As a result, there is a real potential that the NYDOL could, as it did prior to this action, find Individual Plaintiffs ineligible for unemployment insurance benefits. Finally, even if Individual Plaintiffs' unemployment insurance benefits remain unchanged, Defendants' argument does not address other NYTWA members who may still be subject to denials or delays if the NYDOL's current harmful practice goes unremedied.

That Individual Plaintiffs and other NYTWA app-based members may receive benefits pursuant to Pandemic Unemployment Assistance ("PUA") and Federal Pandemic Unemployment Compensation ("FPUC") does not alter the Court's conclusion. (Defs.' Opp'n 9–11.) By way of background, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), 15 U.S.C.A. § 9021. Section 2102 of the CARES Act establishes PUA—a temporary federal program that provides up to thirty-nine weeks of benefits to individuals who are not otherwise eligible for state unemployment insurance benefits. *See* 15 U.S.C. §§ 9021(c)(2), (a)(3)(A)(i). That is, PUA benefits and unemployment insurance benefits are mutually exclusive. It may be the case that in many instances PUA serves to fill the gap for those denied unemployment insurance benefits. PUA does nothing, however, for those who receive reduced unemployment insurance benefits. Take Rumon for example. Based on his employment with Subway, he was approved for weekly unemployment insurance

16

benefits in the amount of $155—far short of the $504 weekly maximum that he would have been entitled to had his app-based FHV wages been included.  (Rumon Decl. ¶¶ 12, 13.)  However, because Rumon was granted unemployment insurance benefits, regardless how little, he did not qualify for any monies under PUA.  PUA simply is not a perfect remedy.[7]

FPUC does not act as a remedy at all.  Under FPUC, eligible individuals receive $600 per week on top of the weekly benefit amount he or she receives from certain other state unemployment programs.  *See* 15 U.S.C. § 9023(b)(1).  This additional source of income reflects a recognition by Congress that monies under state unemployment insurance programs alone were insufficient to meet basic needs during this time.  *See* @CoryBooker, Twitter (July 25, 2020, 1:37 PM), https://twitter.com/corybooker/status/1287079496785551360?s=21 ("The extra $600 in weekly unemployment benefits has been a lifeline for so many out-of-work Americans during this crisis.  It's helped pay rent, cover mortgage payments, and put food on the table.  We can't let it expire until our economy starts to recover."); *see also* Alaska Dep't Labor, *Federal Pandemic Unemployment Compensation (FPUC) $600.00 Stimulus Payment Q&A*, (2020), https://labor.alaska.gov/documents/COVID-19_FPUC.pdf ("[T]he goal is to try and help all unemployed or partially employed individuals that are no longer working or had their hours reduced due to COVID19, regardless of what program they are eligible to receive benefits from, the $600 stimulus payment is paid in addition to those [unemployment insurance] benefits.").  Suffice to say, this benefit is additive.  Thus, even if an FHV claimant were receiving FPUC benefits, he or she cannot be deemed whole unless he or she is also receiving the full unemployment benefits to which she is entitled.

---

[7] Benefits under PUA are scheduled to expire on December 31, 2020.  *See* 15 U.S.C. § 9021(c)(1)(A).

Moreover, assuming for argument that FPUC operates to remedy any harm, as argued by Defendants, benefits under FPUC are scheduled to expire on July 31, 2020.  *See* 15 U.S.C. § 9023(e)(2).

## II.    Plaintiffs Demonstrate a Clear and Substantial Likelihood of Success on the Merits

In their first cause of action, Plaintiffs allege that Defendants have acted in violation of the "when due" clause of the Social Security Act.  That provision requires the administration of unemployment insurance benefits in a manner that is reasonably calculated to insure full payment of unemployment insurance benefits "when due."  42 U.S.C. § 303(a)(1).  At least one federal district court has found, as this Court does now, that states owe a duty to workers to act in a manner that comports with the Social Security Act, including the "when due" provision.  *See Wilkinson v. Abrams*, 81 F.R.D. 52, 57 (E.D. Penn. 1978) (holding that "the federal defendants clearly owe a duty to the plaintiffs to insure that the state unemployment compensation system tenders benefits to the plaintiffs 'when due'" and finding that the regulations "require strict compliance from the states" in that regard as well).

In opposition, Defendants argue that they cannot have operated in violation of the "when due" clause because Individual Plaintiffs' claims relate to conduct by the NYDOL that precedes any eligibility determination.  (Defs' Opp'n 16.)  Thus, Defendants maintain that only if Plaintiffs were to succeed at any level of the administrative appeal process and obtain a decision of eligibility, would the "when due" clause require the NYDOL to ensure prompt payment.  (*Id.*)  The Court has difficulty finding this argument genuine, let alone persuasive.  Indeed, as Plaintiffs aptly noted, this argument was rejected by the Supreme Court some forty-five years ago.  In *Fusari v. Steinberg*, the Supreme Court went out of its way to clarify that any reading of its prior cases that "benefits are not 'due' under § 303 until administratively deemed payable . . .

18

is not one that we can endorse." 419 U.S. 379, 388 n.15 (1975). The Court went on to explain

that "such a definition of the 'when due' requirement of federal law . . . would nullify the

congressional intention of requiring prompt administrative provision of unemployment benefits."

*Id.* More recently, the Seventh Circuit stated that adopting Defendants' position:

> would render the "when due" clause a virtual nullity, limiting it to those cases where
> the state concedes that unemployment is due someone and simply fails to establish
> administrative mechanisms that result in paying him within a reasonable amount of
> time . . . . If the content of the "when due" clause were so eviscerated, a state could
> take all the time in the world to decide that an unemployed person was entitled to
> compensation, provided that it got the check to him promptly when it did decide[.]

*Pennington v. Didrickson*, 22 F.3d 1376, 1386 (7th Cir. 1994) (internal quotations and citations

omitted).

In the face of this authority, Defendants' argument that the "when due" provision is not at

play here must be soundly rejected. The only question, therefore, is whether Defendants have

met their duty to provide benefits when due. There is a clear and substantial likelihood that they

have not.

The evidence from Individual Plaintiffs alone—putting aside the other approximately

10,000 app-based members of NYTWA—is convincing. Islam filed his claim for benefits based

on his work for Lyft and Juno on March 24, 2020. (Islam Decl. ¶¶ 3, 6.) Neither company had

reported Islam's wage and earnings to the NYDOL. (*Id.* ¶ 11.) As a result, on April 27, 2020,

Islam received an MBD showing $0.00 earnings, rendering him ineligible for unemployment

insurance benefits. (*Id.*) Islam filed a request for reconsideration on April 28, 2020. (Taylor

Decl. ¶ 3.) There is no evidence that a decision on his request has been made. On April 1, 2020,

Ouattara filed for unemployment insurance benefits based on his work for Uber and Lyft.

(Ouattara Decl. ¶¶ 3, 6.) Neither company had reported his wage and earnings to the NYDOL.

(*Id.* ¶ 10.) As a result, on May 13, 2020, he received an MBD reflecting $0.00 earnings. (*Id.*)

He too was deemed ineligible for unemployment insurance benefits. (*Id*.) That same day, he filed a request for reconsideration. (*Id*. ¶ 11.) The NYDOL claims to have no record of his request. On March 24, 2020, Singh filed for unemployment insurance benefits based on his work for an FHV company. (Taylor Decl. ¶ 3, Table A.) As a result, on April 1, 2020, Singh received MBD indicating $0.00 earnings, meaning that he was denied benefits because his employer had not reported his wage and earnings to the NYDOL. (*Id*.) Singh filed a request for reconsideration on April 28, 2020. (*Id*.) After this matter was filed, and some three and half months after Singh's initial claim, the NYDOL indicated that upon reconsideration, Singh qualified for unemployment insurance benefits. (Suppl. Geskey Decl. ¶¶ 23–25.) Rumon applied for unemployment insurance benefits based on his work for Uber, Lyft, and Subway on March 20, 2020. (Rumon Decl. ¶ 7.) Uber and Lyft had not reported his wages and earnings. (*Id*. ¶¶ 9, 10, 13.) As a result, on April 10, 2020, Rumon received an MBD, which only showed wages earned from Subway and did not reflect any earnings for his employment with either Uber or Lyft. (*Id*. ¶ 13.) As a result, Rumon was awarded unemployment insurance benefits at a rate of only $155 weekly. (*Id*. ¶ 12.) On April 15, 2020, Rumon filed a request for reconsideration. (*Id*. ¶ 14; *see also* Taylor Decl. ¶ 12.). Approximately three months later, the NYDOL granted Rumon's request reconsideration and deemed him qualified to receive the maximum rate of unemployment insurance benefits. (Suppl. Geskey Decl. ¶¶ 23–25.) Had Individual Plaintiffs been approved for unemployment insurance benefits at the outset, they would have received them within 2 to 3 weeks of the date on which they were filed.

Plaintiffs attribute these denials and delays to Defendants' failure to classify Individual Plaintiffs and other FHV claimants as employees or require FHV companies to report wage and earnings in contravention of section 571 of New York Labor Law, and thereby in violation of the

Social Security Act.  (Pl.'s Mem. L. Supp. Mot. Prelim. Inj. ("Pls.' Mem.") 14, ECF No. 7.)
Defendants counter that Plaintiffs cannot demonstrate a likelihood of success on the merits,
because contrary to Plaintiffs' assertion, the complaints raised by Individual Plaintiffs were not
caused by any classification of the drivers, and, in any event, the NYDOL does not have the
authority under section 571 to compel the production of wage and earnings.  (Defs.' Opp'n 17–
18, 21.)  Defendants are correct on their points.  There is no evidence that Individual Plaintiffs
were classified as non-employees.  And, it appears that section 571 relates to information that
may be obtained by the NYDOL to ascertain employer contributions as opposed to claimant
eligibility.  *Compare* N.Y. Labor Law § 571 *with* N.Y. Labor Law § 575.  Nonetheless,
Defendants' argument that these facts operate to defeat Plaintiffs' motion proves too much.

Plaintiffs may be misguided as to *why* Defendants have failed to comply with the "when
due" provision.  But *that* Defendants have failed to comply cannot be seriously doubted.  Under
federal regulations, "it is the responsibility of the [NYDOL] to take the initiative in the discovery
of information" used to make unemployment insurance eligibility determinations.  20 C.F.R. Part
602, App. A, Section 6013(A).  "This responsibility may not be passed on to the claimant."  *Id*.
Significantly, these regulations expressly state that the NYDOL can obtain the relevant
information from (in this order), the worker, the employer, or other sources.  *Id*.  As a matter of
practice, the NYDOL has chosen to make its initial eligibility determination based exclusively on
wage and earnings submitted by the employer that it possesses at the time a claim is filed.  (*See*
July 13 Tr. 27:4–13.)  This practice may generally operate in satisfaction of the "when due"
provision.  But, it categorically does not as to FHV claimants.

Defendants have adduced evidence of some efforts on the part of the NYDOL to secure
wage and earnings information from app-based FHV companies.  And, the NYDOL has declared

hundreds of FHV claimants to be employees for which wage and earnings must be reported. App-based FHV companies have appealed the vast majority of those decisions—and then abandoned most of those appeals. (*See* Geskey Decl. ¶¶ 14–16.)  Had those cases been resolved through a hearing, a finding by the referee would have applied not only to the individual claimant, but to other drivers similarly situated.  Section 620 of New York Labor Law provides, in relevant, part:

> When the initial determination of a claim for benefits, upon which a hearing has been requested, involves the question whether any person is or was an employer within the meaning of this article . . . [the referees decision on such question] . . . shall not be deemed limited in its effect to the immediate claimant making the claim for benefits but shall be deemed a general determination of such questions with respect to all those employed by such person or employer. . . .

N.Y. Labor Law § 620.

Thus, the practice by app-based FHV companies of appealing the NYDOL's determinations that a driver is an employee but subsequently abandoning the request for a hearing on the issue allows the companies to avoid a potential determination that any given driver is an employee may be broadly applied to other drivers.  Of course, if the determination that any given driver is an employee was broadly applied, the app-based FHV companies would be required to report the wage and earning data of all drivers.  The app-based FHV companies' practice of appealing and abandoning claims, no matter what the Court may think of it, is permitted under law.  It is the NYDOL's response to this practice that raises concerns of relevance to this suit.

The NYDOL has long been on notice that the app-based FHV companies have taken the position that drivers are self-employed and therefore, they need not broadly report wage and earnings.  *See In the Matter of Uber Technologies, Inc*., UIAB Nos. 596722–596727 (Jul. 12, 2018).  Likewise, the NYDOL has been on notice of the FHV companies' "appeal and abandon"

practice described above.  Indeed, the NYDOL attested that this practice is often employed by

FHV companies and went so far as to agree that this practice is "gamesmanship."  (July 13 Tr.

29:4–30:25.)  Particularly troubling is that in the face of such gamesmanship, the NYDOL's own

practices have allowed for the app-based FHV companies to lead it by the leash.  According to

the NYDOL, "where an employer abandons a hearing while pursuing others (as FHV companies

often do), the NYDOL will not pursue action on the abandoned case until a similar case on the

merits concludes."  (Geskey Decl. ¶ 9.)  This is because, as the NYDOL, explains, the case on

the merits may affect the scope of an audit and impacts how the NYDOL will define similarly

situated workers.  (*Id.*)  Moreover, even when the NYDOL prevails on the merits of a status

determination but there are pending cases for similarly situated claimants, the NYDOL generally

will wait to initiate an audit until concurrent cases have concluded.  (*Id.* ¶ 10.)  And so it goes.

While the NYDOL may be hamstrung by the conduct of app-based FHV companies in its

effort to obtain wage and earnings data universally, this should not, as it has, result in delays to

the prompt payment of unemployment benefits to drivers.  As the NYDOL is fully aware, it need

not in the first instance look exclusively to information provided by employers.  As set out

above, the NYDOL could instead look to other sources of information—principally information

from the drivers themselves.  Indeed, according to the NYDOL, it has already relied on driver

submitted 1099 tax forms and 1040 tax forms to determine unemployment insurance benefits

eligibility, but only after the worker has been predictably denied unemployment insurance

benefits due to the absence of wage and earnings on file from the FHV company.  (July 13 Tr.

39:13–40:19.)  In light of the app-based FHV industry's known categorical refusal to provide

wage and earnings information for drivers, it is the duty of the NYDOL to obtain the necessary

information, in the first instance, from other appropriate sources allowed under law.

Inexplicably it has not.  This failure results in an avoidable and inexcusable delay in the payment

of unemployment insurance to FHV claimants, in violation of the "when due" clause.[8]  *See*

*California Dept. of Human Resources Development v. Java*, 402 U.S. 121, 133 (1971) (holding

that the California procedure providing automatic termination of unemployment benefits, when

an employer files an appeal, violates § 303(a)(1) of the Social Security Act since it is not

"reasonably calculated to insure full payment of unemployment compensation when due.");

*Burtton v. Johnson*, 538 F.2d 765 (7th Cir. 1976) (construing recently enacted federal regulations

to require issuance of unemployment benefits to be made within 14 days of the end of the first

compensable week in order to comply with the "when due" provision); *Fusari*, 419 U.S. at 387–

88 (1975) (observing that "the basic thrust of the statutory 'when due' requirement is timeliness"

and that a system that resulted in average delays of 126 days in delivering benefits  failed to do

so in a timely manner); *Wilkinson v. Abrams*, 81 F.R.D. 52, 56 (E.D. Penn. 1978) ("When the

government does not act with reasonable promptness, those claiming total disability are required

to bear an unreasonable delay and suffer unwarranted deprivation of that which is lawfully

theirs." (citation omitted)); *see also Torres v. New York State Dep't of Labor*, 333 F. Supp. 341,

343 (1971).  Plaintiffs have demonstrated a clear and substantial likelihood of success on the

merits.[9]

## III.    Injunctive Relief is in the Public Interest

Plaintiffs must demonstrate that "the balance of equities tips in [their] favor" and that "an

injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

---

[8] This violation is not cured by the issuance of benefits under PUA.  First, nothing in the language of the Social Security Act provides for an exemption of the "when due" clause where other government benefits are issued through a separate program.  Second, even if it did, not all Individual Plaintiffs or other FHV claimants are eligible to receive PUA.

[9] Having found a clear and substantial likelihood of success on the merits of a violation of the "when due" clause, the Court declines to address Plaintiffs' equal protection claim.

"These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In other words, "because the Government is a party, and the Government's interest is the public interest, the balance of hardships and public interest merge as one factor." *Saget v. Trump*, 375 F. Supp. 3d 280, 339-40 (E.D.N.Y. 2019) (*quoting New York v. U.S. Dep't. of Commerce*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019), *rev'd in part on other grounds sub nom, Dep't of Commerce v. New York,* 139 S. Ct. 2551 (2019)).  In assessing these factors, the court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

Here, the balance of hardships tips decidedly in Plaintiffs' favor.  Unquestionably, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York*, 351 F. Supp. 3d at 676 (citation omitted). Indeed, Defendants have no cognizable interest in failing to pay benefits to FHV claimants when due.  Defendants' only argument advanced on this point is that the current economic climate it would be imprudent to dedicate resources to providing preliminary relief requested by Plaintiffs. To the contrary, it is precisely because of the current economic climate that such immediate relief is demanded.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is GRANTED, in part, as follows:

1. The NYDOL shall convene a designated workgroup to assess and address claimants' Requests for Reconsideration (the "Workgroup").  The Workgroup shall consist of approximately thirty-five (35) NYDOL staff members and existing Liability and Determinations ("L&D") and unemployment insurance benefits staff.  The NYDOL shall on-board and train the staff members within seven (7) days of entry of this Order.  The Workgroup will initially be tasked with running queries to isolate electronic, facsimile, and regular mail Requests for Reconsideration that purport to contain app-based FHV

drivers' wages, giving priority to backlogged requests.  Upon completion of the initial queries to determine the number of backlogged requests, the Workgroup will focus on clearing this backlog in a prioritized manner.  L&D staff will rely on the NYDOL's prior fact finding related to app-based FHV drivers to determine that the wages presented on the 1099 tax forms and other documentation are "covered wages" for the purposes of unemployment insurance benefits. Upon a determination by L&D, the NYDOL's unemployment insurance benefits staff will update the claimant's account to appropriately include the app-based FHV wages.

2. The NYDOL shall clear the total backlog of Requests for Reconsideration within forty-five (45) days of entry of this Order.  Once the backlog is resolved, the Workgroup will remain intact to handle Requests for Reconsideration on an expedited basis, for a time frame to be determined by the NYDOL based on need and resources.  Requests for Reconsideration shall be processed within an average of fourteen (14) days, once the substantial backlog is resolved.

3. The NYDOL shall continue its new Google Application (the "Application") for unemployment insurance benefits, launched on July 10, 2020, which permits claimants to identify wages earned on a 1099 tax form during the application process and instructs claimants to send in documentation electronically through a secured, two-way communication system, mail, or facsimile.

4. Under the Application, MBDs shall be rendered within twenty-four (24) hours of a claimant's completed submission.  NYDOL shall run weekly queries of new applications to isolate the eligible claimants who have received 1099 wages.  These claimants will be flagged for the Workgroup as if they had submitted a Request for Reconsideration.  Priority review will be given to claimants with 1099 wages from app-based FHV drivers.

5. The NYDOL shall provide notice to all unemployment insurance and PUA claimants of the ability to seek reconsideration through existing NYDOL channels such as social media campaign, text message, and two-way communication system.

6. The NYDOL shall assess the feasibility from a resource and logistics perspective of designating a telephone number for Reconsideration questions once the Workgroup is formulated and logistical details are formulated.

7. The Court retains jurisdiction of this action through final judgment, unless divested of jurisdiction by operation of law or court order.  The Court will monitor Defendants' compliance with this Order as contemplated by this Court.

8. Within fourteen (14) days of entry of this Order, Defendants shall file a status report with the Court providing:  (1) details of the Workgroup's findings concerning the number of outstanding Requests for Reconsideration; and (2) the feasibility of designating a telephone number for Reconsideration questions once the Workgroup is.  Plaintiffs shall file any response within five (5) days of submission.

SO ORDERED.

Dated: Brooklyn, New York                /s/ LDH_____
      July 28, 2020                LaSHANN DeARCY HALL
                                    United States District Judge